UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

FRED REYNOLDS,                    )
                                  )
                 Plaintiff,       )
                                  )
        v.                        )        No.  1:05CV23 FRB
                                  )
JO ANNE B. BARNHART,              )
Commissioner of Social Security,  )
                                  )
                 Defendant.       )


<u>**MEMORANDUM AND ORDER**</u>

This cause is on appeal for review of an adverse determination by the Social Security Administration.  All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

## I. Procedural History

On September 11, 2003, plaintiff Fred Reynolds filed an application for Disability Insurance Benefits pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401, <u>et</u> <u>seq.</u>, in which he claimed he became disabled on May 2, 2003.  (Tr. 43-45.)  On that same date, plaintiff filed an application for Supplemental Security Income pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, <u>et</u> <u>seq.</u>, in which he claimed he became disabled on March 2, 2003, due to rotator cuff injury and torn ligaments in his shoulder.  (Tr. 251-54.)  On initial consideration, the Social Security Administration denied plaintiff's claims for benefits.

- 1 -

(Tr. 17, 255, 256-60.)  On June 8, 2004, a hearing was held before an Administrative Law Judge (ALJ).  (Tr. 261-95.)  Plaintiff testified and was represented by counsel.  A vocational expert also testified at the hearing.  On September 23, 2004, the ALJ issued a decision denying plaintiff's claims for benefits.  (Tr. 9-16.)  On January 5, 2005, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  (Tr. 4-6.)  The ALJ's determination thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

A.   Plaintiff's Testimony

At the hearing on June 8, 2004, plaintiff testified in response to questions posed by the ALJ and counsel.  Plaintiff is fifty-three years of age.  Plaintiff has no schooling beyond the tenth grade.  Plaintiff is married and lives with his wife.  (Tr. 267-68.)

From January 1983 to August 2003, plaintiff worked as a laborer/welder's helper at a grain elevator repair company.  (Tr. 57, 269.)  During this period of time, plaintiff also engaged in other intermittent employment including as a barge worker on the river, as a clean up worker for emergency services, as a construction worker, and as a general laborer.  (Tr. 87-87A, 269-72.)

Plaintiff testified that he suffers from a shoulder

condition which limits his ability to lift his left arm. (Tr. 274.)

Plaintiff also testified that approximately two and one-half years prior, he sustained a broken foot. Plaintiff testified that his foot healed "crooked," that he suffers from an ankle impairment as a result, and that he now wears a brace to keep his foot in a straightened position. (Tr. 274-75.) Plaintiff testified that the condition causes him to experience pain in his right hip inasmuch as he tries to shift weight from the affected ankle. (Tr. 274.) Plaintiff testified that his physician has suggested the possibility of "re-breaking" the foot to attempt to bring it in proper alignment upon healing. (Tr. 276.)

Plaintiff testified that he also suffers from a condition affecting his hand and wrist. (Tr. 276.) Plaintiff testified that he severed a vein in his left wrist several years prior resulting in a limitation of motion. (Tr. 276-77.) Plaintiff also testified that his fingers sometimes become in a locked position and that he must pry them open. Plaintiff testified that he experiences pain with the condition. (Tr. 276.)

Plaintiff testified that he takes pain medication at least three times a day for his various conditions. (Tr. 275-77.)

Plaintiff testified that he has been treated recently for allergies and takes medication. (Tr. 280.) Plaintiff testified that his doctor advised him to stay away from dust, grain elevators, fields, and the river on account of the condition. (Tr.

280-81.)

As to his daily activities, plaintiff testified that he tries to mow the lawn and walk, but that when his ankle starts to bother him, he just tries to do little things around the house. (Tr. 277.) Plaintiff testified that he uses a push-mower and, with the help of his wife, is able to mow the lawn in approximately twenty minutes. (Tr. 277-78.) Plaintiff testified that his wife does not let him assist in household chores because he does not know how to do them. Plaintiff testified that he does not go to the grocery store. Plaintiff testified that he engages in no social activities other than visiting his sister. (Tr. 278.)

As to his exertional abilities, plaintiff testified that standing does not bother him too much. Plaintiff testified that he is able to bend over and stoop down. (Tr. 279.) Plaintiff testified that he can sit for up to approximately twenty-five minutes before the pain in his hip requires him to move around. (Tr. 279-80.) Plaintiff testified that he has difficulty with lifting because of his shoulder condition and also because the lifting causes him to experiencing pain in the arch of his affected foot. (Tr. 279.)

The ALJ asked the plaintiff whether he believed he could perform work if he worked in an indoor environment where he never had to lift more than twenty pounds and the most he would have to lift on a regular basis would be ten pounds, could stand and sit as he wished during the course of the day and at least alternate

- 4 -

frequently during the course of the day to relieve his ankle pain, and be trained to do simple work.  Plaintiff equivocated in his response, testifying that he has never worked indoors or performed factory-type work.  (Tr. 282-83.)

B.   Testimony of Vocational Expert

Gregory Jones, a vocational expert, testified at the hearing in response to questions posed by the ALJ and counsel.  Mr. Jones classified plaintiff's previous work as medium and/or heavy and semi-skilled.  (Tr. 286-87.)  The ALJ then asked Mr. Jones to assume an individual of plaintiff's age, education and experience, and also to assume such person to have

> the capacity of exertionally light work with the flexibility to alternate sitting with standing for brief periods hourly.  In other words, if it's sedentary work, primarily sedentary work, stand briefly hourly and vice versa, somebody mostly on their feet alternate.  And in this category you can include, I mean as a subset of this category, those jobs that permit the work to be done either sitting or standing, like raised bench assembler work . . . type things.  Okay?
>
> . . .
>
> The outside parameters I'm setting are light, alternating sitting and standing briefly on an hourly basis, or alternating freely if it's a raised bench would permit the same thing. Left upper extremity, which is non-dominant, no power gripping, no forceful pushing or pulling, and overhead reaching is limited to occasional.  And also the need to avoid concentrated exposure to fumes, odors, dust, gasses, and similar pollutants.
>
> . . .

Avoid also temperature extremes.

. . .

And wetness and humidity.

(Tr. 288.)

Mr. Jones testified that such a person could not perform plaintiff's past relevant work, and further testified that skills from plaintiff's past work would not be transferrable to any work which could be performed within the parameters of the hypothetical posed by the ALJ. (Tr. 288.) Mr. Jones testified, however, that such a person could perform light and unskilled work as a bench assembler and cashier, with such jobs existing at numbers approximating 650 and 3600, respectively, within the region. (Tr. 290-91.) The ALJ then asked if there was sedentary work that such a person could perform, to which Mr. Jones testified that there existed sedentary and unskilled work as a stuffer, with approximately 38,000 such jobs nationally but little to none regionally; and as a semiconductor bonder, with such jobs numbering 24,000 nationally and 200 regionally. (Tr. 291-92.)

### III.  Medical Records

On May 25, 1988, plaintiff was admitted to the emergency room at St. Francis Medical Center after having suffered lacerations to the extensor tendons of the index, long and ring fingers of his left hand. (Tr. 89.) Plaintiff underwent debridement and repair of the tendons and was discharged that same

date.  (Tr. 95-96, 103.)

Plaintiff was admitted to the emergency room at Southeast Missouri Hospital (Southeast) on August 17, 2001, complaining of pain in his ankle and toe after having been struck with a rope while working on a river barge.  (Tr. 192-93.)  X-rays showed a distal tibial fracture on the right, non-displaced, involving the medial malleolus; and a non-displaced fracture of the little toe on the right.  (Tr. 189-91.)  Plaintiff was given Vicodin.[1]  Plaintiff was given crutches and was instructed not to bear weight.  (Tr. 192.)  Upon discharge, plaintiff was diagnosed with fracture of the tibia (right medial malleolus) and fracture of the fifth toe.  (Tr. 193.)

Subsequent to plaintiff's visit to Southeast, plaintiff visited Orthopaedic Associates, P.C., who noted that plaintiff had sustained a displaced medial malleolus fracture to the right ankle. It was noted that plaintiff had been instructed by Southeast Hospital to be non-weight-bearing for six to eight weeks, but that plaintiff's work physician instructed him to return to light duty. (Tr. 180.)  Plaintiff then began weight bearing in a walking boot with continued pain.  A subsequent x-ray showed the fracture line to be healing in good alignment with no significant displacement.

---

[1]Vicodin is indicated for the relief of moderate to moderately severe pain.  Physicians' Desk Reference 1629-30 (55th ed. 2001).

Orthopaedic Associates prescribed Vioxx[2] for plaintiff, which was subsequently changed to Celebrex[3] inasmuch as Vioxx caused plaintiff to become nauseated.  Seven weeks subsequent to his injury, plaintiff was permitted to return to work with restrictions, including no climbing, no ladders, no walking or standing for more than fifteen minutes without a break, and no pushing or pulling more than fifteen pounds.  (Tr. 180-81.)

In November 2001, Orthopaedic Associates noted x-rays of plaintiff's ankle to show it to have healed.  The ankle was non-tender to palpation and plaintiff was noted to be walking comfortably, weight bearing to tolerance.  An ASO brace was provided and plaintiff was instructed to return to full duty at work.  (Tr. 182.)

In 2002, plaintiff returned to Orthopaedic Associates and reported that he experienced pain in his right ankle which prevented him from doing heavy labor.  Plaintiff reported that he had lost two jobs because of the pain.  Physical examination showed some tenderness to palpation along the achilles tendon.  Plaintiff had difficulty flexing his foot beyond neutral.  It was determined that plaintiff had a well-healed fracture with some early

---

[2]Vioxx is indicated for the relief of signs and symptoms of osteoarthritis and for the management of acute pain.  Physicians' Desk Reference 2049-50 (55th ed. 2001).

[3]Celebrex is indicated for the relief of the signs and symptoms of osteoarthritis and rheumatoid arthritis.  Physicians' Desk Reference 2482-83 (55th ed. 2001).

degenerative changes indicative of arthritis.  (Tr. 182.)  It was opined that plaintiff would benefit from physical therapy and anti-inflammatory medications.  Plaintiff was restricted to light work. (Tr. 183.)

In response to plaintiff's continued complaints of pain in his right ankle, Orthopaedic Associates prescribed a brace to hold plaintiff's foot in alignment as he ambulates.  Plaintiff was instructed to continue with physical therapy and his prescription for Celebrex was refilled.  (Tr. 183.)  Plaintiff continued to be restricted to light work.  (Tr. 184.)

Plaintiff subsequently reported to Orthopaedic Associates that he was doing better, but it was noted that plaintiff was making slow progress and continued to have pain.  It was determined that plaintiff would be referred to a work-hardening program to assist plaintiff in returning to full duty as soon as possible.  On April 17, 2002, it was noted that plaintiff was doing quite well, as was reported by plaintiff and his physical therapist.  Plaintiff was instructed to continue with his work-hardening program but to maintain light duty at work.  (Tr. 184.)  With continued progress in the work-hardening program and only mild discomfort, plaintiff was subsequently released to full duty at work.  (Tr. 185.)

On May 22, 2002, plaintiff returned to Orthopaedic Associates and complained that he began experiencing increased pain in his right ankle when he returned to full duty at work. Plaintiff reported that he was unable to continue with his work

because the pain radiated up his leg. (Tr. 186.) An MRI taken May 29, 2002, showed the fracture to be healing and also showed some arthritis. Degenerative osteoarthritic change in the ankle joint with small peri articular spurs was noted. (Tr. 186-87, 194.) It was opined that plaintiff also had a bit of tendonitis. Plaintiff was prescribed Medrol Dose Pak[4] and was instructed to resume taking anti-inflammatory medication. Plaintiff was instructed to stay on light duty at work. (Tr. 187.)

Plaintiff subsequently reported to Orthopaedic Associates that he felt better and had returned to work, and plaintiff was instructed to return to full duty. (Tr. 187.) Plaintiff was last seen by Orthopaedic Associates on June 21, 2002, upon which it was noted that plaintiff mostly had tendonitis with some pain in the ankle. (Tr. 187-88.) It was opined that plaintiff had a three-percent whole body impairment rating due to loss of ankle motion and a six-percent whole body impairment rating due to ankle arthritis, with a total nine-percent whole body partial impairment rating. (Tr. 188.)

Plaintiff visited Dr. Robert Robbins on May 2, 2003, with complaints of pain in his neck, left arm and left shoulder. As to his medical history, plaintiff reported that he fractured his ankle

---

[4]Medrol relieves inflammation (swelling, heat, redness, and pain) and is used to treat certain forms of arthritis, skin and kidney disorders, and severe allergies. Medline Plus (revised Apr. 1, 2003) <http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682795.html>.

about one and one-half years prior. Dr. Robbins noted most of plaintiff's pain to be over the left shoulder area and that plaintiff complained that the pain worsens when he tries to sleep. Dr. Robbins noted plaintiff to have trouble reaching for things. Dr. Robbins diagnosed plaintiff with musculoskeletal dysfunction of the left shoulder and administered Dexamethasone and Depo-Medrol injections.[5] Medrol Dose Pak was prescribed. It was noted that plaintiff had been taking Vioxx but that it caused stomach upset. Dr. Robbins instructed plaintiff to also take Motrin and to return in three weeks for follow up. (Tr. 111.)

Plaintiff returned to Dr. Robbins on May 30, 2003. Plaintiff reported that Medrol Dose Pak caused gastrointestinal upset. Dr. Robbins noted the cortisone injections not to have accomplished much and that plaintiff continued to have problems. It was noted that plaintiff had decreased range of motion about the left shoulder with pain. (Tr. 111.)

On June 6, 2003, x-rays were taken of plaintiff's left shoulder in response to plaintiff's complaints of pain. An old healed fracture of the left clavicle was noted with obvious deformity in the region. Degenerative and sclerotic changes in the region were also noted with obvious decrease in the space between the superior aspect of the humeral head and acromion process of the

---

[5]Dexamethasone and Depo-Medrol are steroids primarily used for their potent anti-inflammatory effects. Physicians' Desk Reference 1912, 2594 (55th ed. 2001).

- 11 -

scapula, with such findings noted to be described in chronic rotator cuff pathology.  (Tr. 108.)

Plaintiff returned to Dr. Robbins on June 11, 2003, for follow up regarding musculoskeletal dysfunction of the left shoulder.  The recent x-rays were noted.  Dr. Robbins noted there to be decreased range of motion about the shoulder with no appreciable change or improvement whatsoever.  It was determined that an MRI would be scheduled.  Plaintiff was instructed to return in ten days.  (Tr. 110.)

An MRI taken of plaintiff's left shoulder on October 16, 2003, showed moderate supraspinatus tendonopathy and focal partial thickness tears; mild infraspinatus tendonopathy; mild hypertrophic spurring of the acromioclavicular joint and mild lateral down-sloping of the acromion, which were noted to be predisposing factors to rotator cuff injury; cystic changes in the humeral head indicative of impingement syndrome, with edema possibly due to impaction injury; and degenerative change in the superior glenoid labrum.  (Tr. 128-29.)

Plaintiff visited Dr. Raymond Ritter on October 28, 2003, for his complaints of pain in his left shoulder.  Plaintiff reported that he began experiencing problems in March 2003 and had not worked since May 2003.  Physical examination showed plaintiff to have difficulty with full abduction and flexion with catching sensations upon abduction and internal rotation.  Dr. Ritter noted plaintiff's recent MRI and x-rays.  Dr. Ritter determined to inject

Celestone[6] to the affected area and opined that plaintiff might be
a candidate for acromioplasty and decompression of the tendon, and
repair of any small tear that might be found.  Plaintiff was
instructed to return in one month.  (Tr. 125.)

On October 28, 2003, a reviewing, non-examining medical
consultant for Disability Determinations completed a Residual
Physical Functional Capacity Assessment (Tr. 113-20) in which it
was opined that plaintiff could frequently lift and/or carry up to
ten pounds and occasionally lift and/or carry twenty pounds; could
stand and/or walk about six hours in an eight-hour workday; could
sit about six hours in an eight-hour workday; and was limited in
pushing and pulling with his upper extremities.  (Tr. 114.)  It was
further opined that plaintiff should never engage in climbing
ladders, ropes or scaffolds, and was limited in reaching with his
left upper extremity.  (Tr. 115-16.)  It was opined that plaintiff
had no visual, communicative or environmental limitations.  (Tr.
116-17.)

On November 25, 2003, Dr. Ritter determined to schedule
plaintiff for acromioplasty rotator cuff repair in response to
plaintiff's continued symptoms, which included pain in the left
shoulder and marked crepitation in the subacromial area.  (Tr.
209.)

_____

[6]Celestone is indicated as adjunctive therapy for, inter alia,
rheumatic disorders.  Physicians' Desk Reference 2881 (55th ed.
2001).

On December 2, 2003, plaintiff was admitted to Southeast Hospital to undergo acromioplasty of the left shoulder and rotator cuff repair. Physical examination upon admission showed plaintiff to have good sensation in his left hand with good grip in the hand. Abduction was noted to be limited with difficulty. Marked subacromial crepitation was noted with internal rotation as well as limited range of motion with external rotation and flexion. Plaintiff was diagnosed with chronic impingement problem of the left shoulder with some degenerative change in the AC joint, and downward sloping of the acromion with impingement problems. (Tr. 196.) Plaintiff underwent outpatient surgery that same date (Tr. 199) and was given Vicodin upon discharge (Tr. 177, 210, 220). Plaintiff was instructed to follow up with Dr. Ritter in one week for possible suture removal. On December 5, 2003, it was noted that plaintiff had called Dr. Ritter and complained that Vicodin was not helping. Lorcet[7] was prescribed. (Tr. 177.)

On December 5, 2003, plaintiff's family physician, Dr. Gregario Rodriguez, reported his opinion to Disability Determinations that plaintiff had a disability which prevented him from engaging in employment or gainful activity with the duration of such incapacity to be twelve or more months. (Tr. 122-23.)

Plaintiff returned to Dr. Ritter for follow up on

_____

[7]Lorcet is a combination of hydrocodone bitartrate and acetaminophen indicated for the relief of moderate to moderately severe pain. Physicians' Desk Reference 1268, 1629-30 (55th ed. 2001).

December 10, 2003. Dr. Ritter determined to begin plaintiff on therapeutic exercises to assist in his recovery. Plaintiff was instructed to return in two weeks at which time range of motion would start to be emphasized. (Tr. 124.)

On December 29, 2003, plaintiff complained to Dr. Ritter that he was having some discomfort in the left shoulder. Dr. Ritter determined to prescribe physical therapy for shoulder rehabilitation and Darvocet[8] was prescribed to take as needed. (Tr. 177.)

On January 14, 2004, plaintiff returned to Dr. Ritter's office with complaints of having a lot of pain and difficulty regaining his range of motion. (Tr. 177-78.) It was noted that plaintiff demonstrated a lot of guarding with range of motion movements, and tenderness was noted about the scalene block. It was determined that plaintiff was making slow progress status-post rotator cuff repair on the left. Plaintiff was prescribed Vicodin for pain, Flexeril for muscle spasms, and Ambien for sleep. It was recommended that plaintiff continue with physical therapy and that he return to see Dr. Ritter in two weeks. (Tr. 178.)

On January 19, 2004, Dr. Ritter noted plaintiff to have some discomfort in his shoulder and difficulty with full abduction. Dr. Ritter opined that plaintiff was not able to do the climbing and pulling necessary for his previous work as a builder of grain

_____

[8]Darvocet is indicated for the relief of mild to moderate pain. Physicians' Desk Reference 1708-09 (55th ed. 2001).

elevators and further opined that plaintiff should try to find some less strenuous type of work if possible. Plaintiff was instructed to continue with physical therapy and to return in six weeks for possible final evaluation. (Tr. 178.)

On February 3, 2004, Dr. Ritter noted x-rays to show plaintiff's left shoulder to have healed. A fracture of the left clavicle was noted. Plaintiff complained of pain in the left clavicular area and medication was prescribed. (Tr. 133.)

Plaintiff underwent physical therapy sessions on twenty-two occasions between December 29, 2003, and February 27, 2004, for his left shoulder condition. (Tr. 142, 146-74.) Upon discharge, plaintiff reported that his shoulder was doing better and that his pain measured at a level three on a scale of one to ten. Plaintiff's physical therapist noted plaintiff to have increased strength and range of motion and decreased complaints of pain. (Tr. 146.) It was noted that plaintiff had obtained maximum benefit. (Tr. 142.)

Plaintiff returned to Dr. Ritter on March 5, 2004, who noted plaintiff to experience much less discomfort. Plaintiff had good range of motion about his shoulder and good hand function. Dr. Ritter noted there to be a little stiffness in the left wrist from an old injury. (Tr. 178.) Dr. Ritter opined that plaintiff could terminate his physical therapy and continue with exercises at home. It was noted that plaintiff would try to return to work later in the Spring. It was felt that no return appointment was

necessary. (Tr. 178-79.)

On March 9, 2004, plaintiff visited Missouri Delta Medical Center for complaints relating to allergic rhinitis. (Tr. 143.)

Plaintiff visited Dr. Ritter on May 19, 2004, for follow up of his left shoulder. Dr. Ritter noted plaintiff to seem to be doing reasonably well. Dr. Ritter noted plaintiff to have good range of motion with minimal discomfort. Plaintiff had a little discomfort in his left clavicle where he had an old injury, discomfort of the left wrist, and stiffness and some problem with the right ankle where he had a previous fracture. Plaintiff indicated that he would try to use his brace again to see if it would support his ankle. Dr. Ritter dismissed plaintiff from treatment for his left shoulder. It was noted that plaintiff questioned whether his foot condition and weakness in his shoulder would permit him to return to his work inasmuch as it required climbing ladders in grain elevators. It was noted that plaintiff felt he could not work and that he may apply for disability. (Tr. 202.)

On May 25, 2004, Dr. Ritter completed a Medical Source Statement in which he opined that plaintiff could lift and/or carry up to five pounds frequently and fifteen pounds occasionally; could stand and/or walk continuously without a break for up to thirty minutes; could stand and/or walk for a total of three hours in an eight-hour work day; could sit continuously without a break for up

to four hours; and could sit for a total of seven hours in an eight-hour workday. Dr. Ritter further opined that plaintiff was limited in pushing and/or pulling with his right ankle and left arm. (Tr. 204.) Dr. Ritter opined that plaintiff should never engage in climbing, balancing, crouching, or crawling; and should only occasionally engage in stooping, bending, kneeling, reaching, and handling. Dr. Ritter opined that plaintiff could frequently engage in fingering, feeling and gripping. As to environmental limitations, Dr. Ritter opined that plaintiff should avoid moderate exposure to extreme cold and wetness/humidity; and should avoid concentrated exposure to weather, dust/fumes, vibrations, hazards, heights, and extreme heat. Dr. Ritter reported that plaintiff had no need to lie down or recline to alleviate his symptoms and had no additional limitations due to pain, medications, assistive devices, or required treatments. (Tr. 205.)

## IV. The ALJ's Decision

The ALJ found that plaintiff met the disability insured status requirements of the Social Security Act on May 2, 2003, and continues to meet them through December 31, 2008. The ALJ also found that plaintiff had not engaged in substantial gainful activity since May 2, 2003, the alleged onset date of disability. The ALJ found plaintiff to have severe impairments, and specifically, status-post left rotator cuff repair, status-post right ankle fracture, and status-post left wrist grinder injury,

but that such impairments, either singly or in combination, did not meet or medically equal an impairment listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ also found plaintiff's allegations to be generally credible, but not to the extent of establishing disability. The ALJ found plaintiff to have the residual functional capacity (RFC) to perform the physical exertional and non-exertional requirements of work except for work not allowing rotations between sitting, standing, and walking once an hour; work requiring power gripping with the left upper extremity, forceful pushing or pulling with the left upper extremity, and more than occasional overhead reaching; and work requiring concentrated exposure to fumes, dust, and other air pollutants, temperature extremes, and humidity. The ALJ determined plaintiff unable to perform his past relevant work. The ALJ found plaintiff's capacity to perform the full range of light work to be reduced by his limitations as set out above. Based on plaintiff's age, education, work experience, and non-exertional limitations, the ALJ found that plaintiff could perform a significant number of jobs in the national economy, such as bench assembly, cashier, stuffer, and semiconductor bonder. The ALJ thus concluded that plaintiff was not under a disability at any time through the date of the decision. (Tr. 15-16.)

## V. Discussion

To be eligible for Social Security Disability Insurance

Benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that he is disabled. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001); <u>Baker v. Secretary of Health & Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities. If the claimant's

impairment(s) is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).

To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

- 21 -

> 4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.
>
> 5. Any corroboration by third parties of the plaintiff's impairments.
>
> 6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068(8th Cir. 2000)). A Commissioner's decision may not be reversed merely because substantial evidence also exists that would support a contrary outcome. Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole. Plaintiff first claims that the ALJ erred in his recitation of plaintiff's testimony and that the testimony credited by the ALJ demonstrates plaintiff's inability to work. Plaintiff also claims that the ALJ erred in relying on the testimony of the vocational expert inasmuch

as the hypothetical posed to the expert did not contain all of plaintiff's limitations which the ALJ found to be credible. Finally, plaintiff claims that the ALJ's RFC determination is not supported by any medical evidence and, further, that the ALJ erroneously found plaintiff to have the RFC to perform unskilled light work inasmuch as his finding that plaintiff required a sit/stand option at his choice precluded such unskilled work.

A.   Plaintiff's Testimony

Plaintiff claims that the ALJ erred in his evaluation of plaintiff's testimony inasmuch as, in his written decision, the ALJ credited plaintiff's assertion that he could perform work when a review of the hearing transcript shows plaintiff not to have so testified.   Plaintiff further claims that crediting his actual testimony shows him unable to engage in any work activity.

In his written decision, the ALJ addressed plaintiff's hearing testimony and found as follows:

> At the hearing, the claimant's allegations were generally credible, to the extent he admitted he could work with a sit/stand option. . . . The claimant testified he did not know why he could not do a job with a sit/stand option, performing indoor-type of work.
>
> . . .
>
> As noted above, the claimant admitted he was capable of performing work activities with a sit/stand option, and he did not know why he could not perform such work activities.

(Tr. 13-14.)

A review of the hearing transcript, however, shows the actual exchange between the ALJ and plaintiff:

> Q.   Mr. Reynolds, even if I assume that you cannot return to the work that you've done previously because of your various medical problems, if you had a job where -- I know you said you never worked in a factory before, but think about it for a minute.  If you had a job where you're working indoors so you weren't exposed to the dust and fumes from farm equipment and other things, you know, pollutants in the air.  You worked in an indoor environment where you never had to lift more than 20 pounds at a time and the most you had to lift on a regular basis would be 10 pounds.  And you could stand or sit as you wished, during the course of the day, you could at least alternate frequently during the course of the day, to relieve your ankle pain and so forth.  Is there any reason you couldn't do that kind of job?  If you could stand or sit?
>
> A.   Well, I never been in -- I never worked on [sic] inside job.  I always been outside, you know.  I guess, you know, I hadn't ever worked in a factory --
>
> Q.   Yeah.
>
> A.   -- or nothing like that.
>
> Q.   But if you could be trained to do that within a couple of days up to a month -- usually, we define unskilled work as something that could be learned in 30 days or less, sometimes as short as a day.
>
> A.   Yeah.
>
> Q.   If you could be taught how to do simple work, working indoors in that kind of a setting, is there a reason you couldn't do that --

A.    Well ––

        Q.    –– based on your physical impairments.

        A.    –– if I could do it, you know, I'd
        [INAUDIBLE].

(Tr. 281-82.)


The undersigned agrees that plaintiff's testimony regarding his
ability to engage in the described work activity was not as
affirmative as the ALJ suggests.  Indeed, a review of the hearing
transcript shows such testimony to be equivocal at best.  The
Commissioner argues that plaintiff's response of "Yeah" to the
ALJ's questioning shows plaintiff's affirmative belief in his
ability to perform work.  Placed in context, however, this
utterance made *during the course of* the ALJ's question appears to
demonstrate plaintiff's understanding of the ALJ's definition of
unskilled work rather than an unequivocal statement that he could
perform such work.

        Regardless, to the extent the ALJ erred in his recitation
of plaintiff's testimony, such error was harmless.  A review of the
ALJ's decision in its entirety shows his determination of
plaintiff's ability to perform work-related activities to have been
based upon his consideration of the entire record as a whole and
not solely upon his interpretation of plaintiff's testimony.
Indeed, the ALJ thoroughly discussed all the medical evidence of
record, including results of diagnostic tests, observations and

reports of plaintiff's treating physicians and physical therapists, and plaintiff's own description of his symptoms and limitations. See Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); 20 C.F.R. §§ 404.1545(a), 416.945(a). Inasmuch as the ALJ's determination of plaintiff's RFC was based upon a review of all the evidence of record and did not hinge upon his unsupported finding that plaintiff admitted he could work, the undersigned considers such finding not to affect the substantial rights of any party and, as such, shall not regard such error as a basis for reversal of the Commissioner's decision. 28 U.S.C. § 2111 (harmless error); see Sahara Coal Co. v. Office of Workers Comp. Programs, United States Dep't of Labor, 946 F.2d 554, 558 (7th Cir. 1991) (harmless error analysis appropriate in judicial review of administrative adjudication); e.g., Brueggemann v. Barnhart, 348 F.3d 689, 695-96 (8th Cir. 2003) (harmless error analysis in judicial review of decision of the Social Security Administration); Reeder v. Apfel, 214 F.3d 984, 987-88 (8th Cir. 2000) (same); Greene v. Sullivan, 923 F.3d 99, 101 (8th Cir. 1991) (same).

To the extent plaintiff claims that by crediting plaintiff's testimony, the Commissioner must necessarily find plaintiff to be disabled inasmuch as such testimony shows him unable to work, the undersigned notes that subjective complaints alone cannot constitute a basis upon which to find a claimant disabled. See 20 C.F.R. §§ 404.1528(a), 416.928(a) ("Your statements alone, however, are not enough to establish that there

is a physical or mental impairment."). Instead, "there must be medical signs and laboratory findings which show . . . a medical impairment(s) which could reasonably be expected to produce the . . . symptoms alleged and which, when considered with all of the other evidence . . . , would lead to a conclusion that [the claimant is] disabled." 20 C.F.R. §§ 404.1529(a), 416.929(a).

As set out above, a determination as to whether a claimant is or is not disabled cannot be based upon a claimant's subjective statements alone. Because the ALJ here did not base his adverse decision solely on plaintiff's testimony but rather upon his review of the entire record as a whole, it cannot be said that the ALJ's determination to generally credit plaintiff's testimony but nevertheless find plaintiff not to be disabled constituted reversible error.

B.  <u>Vocational Expert Testimony</u>

Plaintiff also claims that the ALJ erred in relying on the testimony of the vocational expert inasmuch as the hypothetical posed to the expert did not contain all of plaintiff's limitations which the ALJ found to be credible. For the following reasons, plaintiff's argument must fail.

Plaintiff specifically claims that the ALJ failed to pose a hypothetical question to the vocational expert which contained the limitation that plaintiff must be able to alternate between sitting and standing "as he wished." Plaintiff contends that because the ALJ's decision hinged upon his perception of

plaintiff's testimony that he could work if he could sit and stand "as he wished," the failure to include such a specific limitation to the vocational expert requires reversal. As discussed <u>supra</u> at Section V.A, however, the ALJ's decision was not based solely upon plaintiff's testimony but instead was based upon a proper review of the entire record, including medical and other evidence. Further, in his written decision, the ALJ found plaintiff's exertional and non-exertional limitations to be only those which he posed to the vocational expert in the hypothetical question:

> The claimant has the residual functional capacity to perform the physical exertional and nonexertional requirements of work except for work not allowing rotations between sitting, standing, and walking once an hour, work requiring power gripping with the left upper extremity, forceful pushing or pulling with the left upper extremity, and more than occasional overhead reaching; work requiring concentrated exposure to fumes, dust, and other air pollutants, temperature extremes, and humidity.

(Tr. 15.) (<u>Compare</u> Tr. 288-92.)

Nowhere in his written decision does the ALJ conclude that the plaintiff is limited to work which permits him to sit and stand as he wishes. The ALJ therefore did not err in failing to include such a limitation in the hypothetical question posed to the vocational expert. <u>See</u> <u>House v. Shalala</u>, 34 F.3d 691, 694 (8th Cir. 1994) (hypothetical question posed to vocational expert must include all physical and mental impairments ALJ finds credible);

cf. Grissom v. Barnhart, 416 F.3d 834 (8th Cir. 2005) (where hypothetical fails to include impairments and limitations found by ALJ to be credible, vocational expert's testimony given in response cannot serve as substantial evidence).

C.    RFC Determination

        Plaintiff challenges the ALJ's RFC determination and appears to argue that such determination is flawed inasmuch as it is based only on plaintiff's testimony and not upon any medical evidence.  Plaintiff specifically claims that no evidence supports a finding that plaintiff can perform a job with a sit/stand option.

        Residual functional capacity is what a claimant can do despite his limitations.  Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001).  The ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations.  Goff, 421 F.3d at 793; 20 C.F.R. §§ 404.1545(a), 416.945(a).  A claimant's RFC is a medical question, however, and some medical evidence must support the ALJ's RFC determination.  Hutsell v. Massanari, 259 F.3d 707, 711-12 (8th Cir. 2001); Lauer v. Apfel, 245 F.3d 700, 703-04 (8th Cir. 2001). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. Hutsell, 259 F.3d at 712.

        Plaintiff claims that, other than his testimony, no

evidence in the record supports the ALJ's finding that plaintiff could perform work that has a sit/stand option. Contrary to this assertion, and as noted by the ALJ, Dr. Ritter opined in his Medical Source Statement that plaintiff could stand and/or walk up to thirty minutes continuously, and up to three hours total in an eight-hour workday; and could sit up to four hours continuously (at one time, without a break) and up to seven hours total in an eight-hour work day. Coupling this evidence with the plaintiff's testimony as to his daily activities such as mowing the lawn, the ALJ found that plaintiff could perform work which would permit him to, inter alia, rotate between sitting, standing and walking once an hour. This finding as to plaintiff's need for a sit/stand option is in fact more restrictive than that of plaintiff's treating physician, who determined that plaintiff could sit continuously for hours at a time without a break. See, e.g., Tucker v. Barnhart, 363 F.3d 781, 783-84 (8th Cir. 2004) (ALJ's RFC determination supported by substantial evidence where he found claimant's limitations to be more restrictive than those imposed by treating physician). Because the ALJ's RFC finding as to the sit/stand option is supported by some medical evidence in the record, the ALJ did not err in this determination.

Notably, however, the ALJ determined to discredit that portion of Dr. Ritter's Medical Source Statement which limited plaintiff's lifting ability to five pounds frequently and fifteen pounds occasionally. (Tr. 14.) Instead, the ALJ appeared to find

plaintiff able to perform the lifting requirements of light work, that is, lifting no more than twenty pounds occasionally and ten pounds frequently. 20 C.F.R. §§ 404.1567(b), 416.967(b). The ALJ gives no reason for discounting this portion of Dr. Ritter's Statement, nor does the ALJ cite any medical or other evidence of record to support his finding that plaintiff can lift weight in excess of that determined by his treating physician. It is well settled that an ALJ may not substitute his opinion for that of the claimant's physician. Delrosa v. Sullivan, 922 F.2d 480, 484 (8th Cir. 1991); Ness v. Sullivan, 904 F.2d 432, 435 (8th Cir. 1990); see also Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000). As such, it cannot be said that substantial evidence on the record as a whole supports the ALJ's implicit RFC finding that plaintiff is able to lift weight consistent with that required of light work.

Such does not end the inquiry, however. Although substantial evidence does not support the ALJ's finding that plaintiff can perform the lifting requirements of light work, there nevertheless exists substantial evidence to support a narrower finding that plaintiff can perform the lifting requirements of sedentary work, and specifically, that plaintiff can lift no more than ten pounds at a time and occasionally lift or carry articles like docket files, ledgers and small tools. 20 C.F.R. §§ 404.1567(a), 416.967(a). Indeed, the opinion of plaintiff's treating physician, Dr. Ritter, as rendered in his Medical Source Statement, supports this finding.

Where substantial evidence supports a narrower finding than that made by the Commissioner as to the level of work a claimant may perform, the Court is authorized to modify the Commissioner's decision to reflect such finding. 42 U.S.C. § 405(g) ("The court shall have power to enter, upon the pleadings and transcript of the record, a judgment . . . modifying . . . the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."); Blacknall v. Heckler, 721 F.2d 1179, 1181 (9th Cir. 1983) (per curiam); Bocanegra v. Shalala, 888 F. Supp. 115, 119 (C.D. Cal. 1995) (court has authority "to modify the [Commissioner's] decision by rejecting unsupported broad findings and replacing them with alternative findings that are 'lesser included' findings implicitly made by the [Commissioner].").

In this cause, the ALJ posed hypothetical questions to the vocational expert wherein the ALJ asked the expert to assume plaintiff able to perform the exertional requirements of light work (Tr. 289-90), and then to assume that plaintiff could perform the exertional requirements of sedentary work (Tr. 291-92). In his written decision, the ALJ found plaintiff to have the exertional ability to perform the lifting requirements of light work and, relying upon the vocational expert's testimony, determined plaintiff able to perform work as it exists in the national economy, including bench assembly and cashier, which was characterized by the vocational expert as light work; and

semiconductor bonder and stuffer, which was characterized by the vocational expert as sedentary work. Where the Commissioner determines a claimant to be able to perform light work, such determination includes an implicit finding that the claimant can also perform sedentary work. 20 C.F.R. §§ 404.1567(b), 416.967(b). Inasmuch as substantial evidence on the record as a whole supports a finding that the plaintiff has the RFC to perform the lifting requirements of at least sedentary work; and that when considering plaintiff's other credited limitations, the vocational expert opined that plaintiff could perform a significant number of jobs existing at this sedentary level; and that no additional factors are evident on the record which would preclude plaintiff from performing such sedentary work, there continues to be substantial evidence on the record as a whole that plaintiff retains the RFC to perform work, albeit sedentary rather than light work, and thus was properly determined not to be under a disability.

Accordingly, the decision of the Commissioner denying plaintiff's claims for benefits should be modified to reflect that, upon consideration of plaintiff's age, education, work experience, and residual functional capacity to perform work, plaintiff can perform a significant number of jobs which exist in the national economy at the sedentary level of work, such as stuffer and semiconductor bonder, to which the vocational expert testified at the administrative hearing. With such modification, the Commissioner's determination that plaintiff is not under a

disability should be affirmed.

Finally, plaintiff appears to argue that Social Security Ruling 83-12 advises that a sit/stand option as imposed by the ALJ here is available only to professional and managerial jobs, and thus that the performance of unskilled work is precluded by such restriction. (Pltf.'s Brief at 12.) As noted by the Eighth Circuit in Carlson v. Chater, 74 F.3d 869 (8th Cir. 1996), however, such an argument is based upon an incomplete reading of SSR 83-12, which states, in relevant part, that "[i]n cases of unusual limitation of ability to sit or stand a [vocational specialist] should be consulted to clarify the implications for the occupational base." See id. at 871. The ALJ here found plaintiff not able to perform the full range of either sedentary or light work inasmuch as he was limited by various non-exertional limitations, and, as such, solicited the testimony of a vocational expert. As required by SSR 83-12, the ALJ asked the vocational expert to take into account plaintiff's need to have a sit/stand option when assessing what jobs plaintiff could perform. Because there exists evidence from a vocational specialist that a person with plaintiff's limitations can perform unskilled work, plaintiff's claim that SSR 83-12 requires a finding otherwise is without merit. See, e.g., Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (questions to vocational expert underscored need to sit and stand at will and expert took such need into account in assessing unskilled jobs claimant was capable of performing).

Therefore, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is modified to reflect that, given plaintiff's age, education, work experience, and residual functional capacity to perform work, plaintiff can perform a significant number of jobs which exist in the national economy at the sedentary level of work.

**IT IS FURTHER ORDERED** that the decision of the Commissioner is affirmed, as modified, and plaintiff's Complaint is dismissed with prejudice.

Judgment shall be entered accordingly.


_____
UNITED STATES MAGISTRATE JUDGE


Dated this _20th_ day of March, 2006.